## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

CHARLOTTE KOCOCINSKI,                                    Civil No. 12-633 (JRT/JJG)
*Derivatively On Behalf of Medtronic, Inc.*,

                                    Plaintiff,

v.

ARTHUR D. COLLINS, JR.,
WILLIAM A. HAWKINS, GARY ELLIS,
RICHARD H. ANDERSON,
DAVID CALHOUN, VICTOR J. DZAU,                  **MEMORANDUM OPINION AND**
SHIRLY ANN JACKSON,                                  **ORDER GRANTING**
JAMES T. LENEHAN, DENISE M. O'LEARY,        **DEFENDANTS' MOTION TO**
KENDALL J. POWELL, ROBERT C. POZEN,                  **DISMISS**
JEAN-PIERRE ROSSO, JACK W. SCHULER,
MICHAEL R. BONSIGNORE,
GORDON M. SPRENGER,
WILLIAM R. BRODY, OMAR ISHRAK,

                                    Defendants,

and

MEDTRONIC, INC.,

                                    Nominal Defendant.

Francis A. Bottini, Jr., **BOTTINI & BOTTINI, INC.**, 7817 Ivanhoe Avenue, Suite 102, La Jolla, CA 92037; and Garrett D. Blanchfield, Jr., **REINHARDT WENDORF & BLANCHFIELD**, 332 Minnesota Street, Suite E-1250, St. Paul, MN 55101, for plaintiff.

Peter W. Carter and Michelle S. Grant, **DORSEY & WHITNEY LLP**, 50 South Sixth Street, Suite 1500, Minneapolis, MN 55402, for defendants.

Patrick S. Williams, **BRIGGS & MORGAN, PA**, 80 South Eighth Street, Suite 2200, Minneapolis, MN 55402, for nominal defendant.

This is a shareholder derivative action brought by Charlotte Kococinski on behalf

of nominal party Medtronic, Inc. ("Medtronic") against many of Medtronic's current and

former directors and officers, alleging that defendants breached fiduciary duties and violated securities laws by failing to prevent and misleadingly concealing Medtronic's illegal marketing of one of its drugs. Kococinski brought the present action without first making a demand on Medtronic's current Board of Directors ("Board") to address the alleged misconduct. Defendants move to dismiss on the basis that Kococinski failed to adequately plead that such a demand would have been futile. For the reasons explained below, the Court finds that Kococinski has failed to establish that demand was futile because she has not established that at least half of the Board faces a substantial likelihood of personal liability for the challenged conduct. Therefore, the Court will grant defendants' motion to dismiss.[1]

## BACKGROUND[2]

### I.      THE PARTIES

Medtronic is a Minnesota corporation that manufactures medical devices. (Compl. ¶ 2, Mar. 12, 2012, Docket No. 1.) Kococinski is a Pennsylvania citizen who is a current Medtronic shareholder and has owned Medtronic stock at all relevant times. (*Id.* ¶ 14.)

---

[1] The Court will dismiss without prejudice and allow Kococinski to amend her complaint. If Kococinski elects to amend her complaint, the Court urges her to consider exercising her statutory right to examine Medtronic's books and records in order to potentially bolster her allegations. *See* Minn. Stat. § 302A.461, subd. 4. Kococinski may file an amended complaint within 60 days of this Order.

[2] On a motion to dismiss, "[t]he court may consider, in addition to the pleadings, materials 'embraced by the pleadings' and materials that are part of the public record." *In re K-tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881, 889 (8th Cir. 2002) (quoting *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999)). The facts set forth come from those sources.

Defendants are eleven of the twelve current members of the Board ("the Directors"),[3] two former Medtronic CEOs and Chairmen of the Board, one current Medtronic executive who is not on the Board, and three former Board members.[4]  (*Id.* ¶¶ 16-32.) Omar Ishrak, one of the current Board members named in the complaint, has been the Chairman of the Board and Medtronic's CEO since 2011.  (*Id.* ¶ 32.)  Ishrak is the only current Board member that is employed by Medtronic.  The other ten Director defendants (the "outside directors") are "independent" under the rules of the New York Stock Exchange, meaning they have no material relationship to Medtronic other than serving on the Board.  (Decl. of Peter W. Carter, Ex. 1 ("2011 Proxy Statement") at 11, May 25, 2012, Docket No. 11.)

## II.    THE INFUSE BONE GRAFT

Kococinski's allegations focus on Medtronic's INFUSE Bone Graft ("Infuse"), which is a surgically-implanted medical device that stimulates bone growth.[5]  (*Id.* ¶¶ 2-3.)   The Federal Food and Drug Administration ("FDA") approved Infuse for a limited number of surgical applications.  (*Id.* ¶¶ 3, 48.)  FDA-approved uses for a medical device

---

[3] The Director defendants are Richard H. Anderson, David Calhoun, Victor J. Dzau, Shirley Ann Jackson, James T. Lenehan, Denise M. O'Leary, Kendall J. Powell, Robert C. Pozen, Jean-Pierre Rosso, Jack W. Schuler, and Omar Ishrak.

[4] These defendants are Arthur D. Collins, Jr., William A. Hawkins, Gary Ellis, Michael R. Bonsignore, Gordon M. Sprenger, and William R. Brody.

[5] According to the complaint, Medtronic's business is divided into seven segments – Spinal, Cardiac Rhythm Disease Management, Cardiovascular, Neuromodulation, Diabetes, Surgical Technologies, and Physio-Control.  (Compl. ¶ 34.)  The Spinal segment includes "Core" Spinal products and "Biologics" Spinal products and Medtronic reports the performance of Core Spinal and Biologics Spinal separately.  (*Id.* ¶ 37.)  Infuse accounted for much of Medtronic's Biologics Spinal sales between 2002 and 2008.  (*Id.*)

are known as "on-label" uses.  (*Id.* ¶ 3.)  "Off-label" uses for a medical device are uses that have not been approved by the FDA.  (*Id.* ¶ 4.)  A physician may use a medical device off-label; however, it is illegal for a manufacturer to promote a device for off-label use.  (*Id.*)  Infuse generates approximately $800 million in revenue each year, which accounts for six percent of Medtronic's total annual sales.  (*Id.* ¶¶ 2, 37.)  The vast majority of Infuse sales (approximately eighty-five percent) involved off-label use of the device. (*Id.* ¶ 4.)

### III.   2006 WHISTLEBLOWER SETTLEMENTS AND THE CORPORATE INTEGRITY AGREEMENT

In 2006, Medtronic announced that it had settled two whistleblower lawsuits relating to Infuse with the Department of Justice ("DOJ") for $40 million.  (*Id.* ¶ 38.) Both whistleblower suits alleged that Medtronic had engaged in illegal marketing and sales practices, including the payment of improper consulting fees to physicians who promoted Medtronic's spinal products, including Infuse.  (*Id.*)  Medtronic was not required to admit to any wrongdoing or illegal activity, (*id.* ¶ 59), but as part of the settlement Medtronic entered into a five-year Corporate Integrity Agreement ("CIA"), which implemented oversight procedures that were intended to guarantee "top-level attention to corporate compliance measures," (*id.* ¶ 44.)  The CIA required Medtronic to adopt procedures to ensure stricter regulatory compliance, including ensuring that any of the company's arrangements with doctors would not violate federal law. (*Id.* ¶ 45.)

IV.    **ADDITIONAL SCRUTINY OF MEDTRONIC'S ALLEGEDLY ILLEGAL PROMOTION OF INFUSE AND THE SCOPE OF OFF-LABEL SALES**

Kococinski also presents evidence of a series of events that occurred beginning in 2007 that allegedly shed light on the Board's knowledge of details surrounding the marketing and sales of Infuse.  First, articles appeared in the Wall Street Journal and The New York Times on September 27, 2007, that reported on a letter United States Senator Charles Grassley sent to then-CEO of Medtronic William Hawkins requesting a briefing from Medtronic on payments Medtronic made to physicians in connection with promoting off-label uses of Infuse.  (*Id.* ¶ 94.)  One of the articles suggested that Medtronic may have continued making illegal payments to physicians for several months after the DOJ settlement and the adoption of the CIA.  (*Id.*)  A Medtronic spokesperson responded with an article in the Minneapolis-St. Paul Business Journal asserting that Medtronic's payments to doctors had been "fully compliant with the law and industry standards."  (*Id.*)

On July 1, 2008, the FDA issued a public health notification to healthcare practitioners, warning of serious complications caused by off-label use of Infuse in the cervical spine and recommending that practitioners "either use approved alternative treatments or consider enrolling as investigators in approved clinical studies."  (*Id.* ¶ 118.)  In the wake of the news coverage and FDA notification, on November 18, 2008, Medtronic reported that its financial results for the second quarter of 2009 (which ended in October 2008) declined $30 million from the previous quarter, stemming from a decline in Infuse sales.  (*Id.* ¶¶ 124-25.)   Medtronic also disclosed on November 18 that

it had "recently received a subpoena from the Department of Justice looking into off-label use of Infuse." (*Id.*)

Next, a series of news stories published between December 2008 and August 2009 revealed more information about the financial arrangements Medtronic allegedly had with several doctors and surgeons for the purpose of promoting Infuse for off-label uses. (*Id.* ¶¶ 129-43.)   Much of the information provided in these articles was initially uncovered by Senator Grassley's inquiry into Medtronic's physician consulting arrangements.[6]   (*See, e.g.*, *id.* ¶ 131.)   For example, a December 12, 2008 Minneapolis StarTribune article reported on prior agreements between surgeons at the Twin Cities Spine Center and Medtronic that allegedly provided financial incentives for surgeons who promoted Medtronic's products for off-label uses.  (*Id.* ¶ 130.)  And on January 16, 2009, the Wall Street Journal reported on Medtronic's payments to a surgeon at the University of Wisconsin who authored some of the preliminary studies that led to the FDA's approval of Infuse.  (*Id.* ¶ 131.)  According to the article, the surgeon received between $2.6 and $4.6 million per year from Medtronic, a sum far greater than what he reported to the university.  (*Id.*)   On May 13, 2009, The New York Times reported that the United States Army's investigation into a study authored by a former Army surgeon and professor at Washington University in St. Louis concluded that the study made false claims that overstated the benefits of Infuse in treating wounded soldiers.  (*Id.* ¶ 132.)

---

[6] Kococinski provided to the Court a United States Senate report that was released on October 25, 2012, highlighting the results of Senator Grassley's investigation.

The Wall Street Journal later reported that the surgeon who authored the study had received almost $850,000 in payments from Medtronic over the course of ten years, primarily during the years when he was attempting to publish his study with medical journals.[7] (*Id.* ¶ 137.)

Medtronic's 2009 Form 10-K stated that the company had received subpoenas from the United States Attorney's Office for the District of Massachusetts and the New Jersey Attorney General requesting documents related to the Army study described above and to Medtronic's financial arrangements with certain physicians. (*Id.* ¶ 149.)

## V.      ALLEGEDLY MISLEADING FINANCIAL REPORTS

Kococinski alleges that a series of Medtronic's financial reports signed by current and former Medtronic directors and officers between November 2006 and September 2008 were false or misleading. (*See id.* ¶¶ 56-112.) A representative example is Medtronic's 2007 Form 10-K, which was signed by eleven defendants, including six current directors (Anderson, O'Leary, Pozen, Lenehan, Rosso, and Schuler). (*Id.* ¶ 86.) The 2007 Form 10-K stated more than once that the growth of Medtronic's Biologics sales was "based on continued strong acceptance of [Infuse.]" (*Id.*) The 2007 Form 10-K also referred to the CIA, which Medtronic entered into as part of the 2006 whistleblower settlements. (*Id.* ¶ 87.) Specifically, the 2007 Form 10-K stated that the CIA "further strengthens [Medtronic's] employee training and compliance systems

---

[7] The articles revealed multiple other surgeons with various financial ties to Medtronic, several of which were not included in the list Medtronic had previously provided to Senator Grassley. (Compl. ¶¶ 131, 136, 139-42.)

surrounding sales and marketing practices" and "reflects Medtronic's assertion that the Company and its current employees have not engaged in any wrongdoing or illegal activity." (*Id.*)

Kococinski alleges that the 2007 Form 10-K and the other similar financial reports filed between November 2006 and September 2008 were false and misleading because they failed to disclose that "(a) [Eighty-five percent] of Infuse's revenues were dependent upon off-label uses of the product; (b) off-label uses of Infuse were causing a significant and increasing number of medical complications to patients; and (c) [Medtronic] was engaging in an unlawful campaign to market and encourage off-label uses of [Infuse] in direct violation of the [CIA]." (*Id.* ¶ 6.)[8]  Further, because of the scope of Infuse's sales and the scrutiny described above (much of which arose after the allegedly false and misleading reports), Kococinski contends that the directors **knew** that the financial reports were false and misleading when they issued them.

## VI.   MEDTRONIC'S STOCK REPURCHASES

Kococinski also points to stock repurchases of over $2.8 billion that the Board authorized between 2005 and 2007.  (*Id.* ¶¶ 154-61.)  Kococinski alleges that the Board

---

[8]  Kococinski also points to several investor conference calls that occurred between November 2006 and September 2008 during which Medtronic's officers allegedly reinforced the false and misleading nature of the financial reports.  For example, during a conference call on August 18, 2008, then Chairman and CEO-Hawkins stated that the continued growth in Biologics was due to FDA approval of "two smaller kit sizes of Infuse" and that the company expected long-term growth for its Spinal products based on "a series of expanded indications for . . . Infuse." (Compl. ¶¶ 109-11.)  Hawkins was not on Medtronic's board of directors at the time that Kococinski's complaint was filed and no current member of the Board participated in these investor conference calls described in the complaint. (*See id.* ¶¶ 64-68, 71-73, 77-83, 109-11.)

knew that the value of Medtronic's stock was artificially inflated because of the false and misleading financial reporting but authorized the repurchases nonetheless.[9]  (*Id.* ¶¶ 156-58.)  Kococinski therefore asserts that the Directors who authorized the repurchases, a group that includes ten current Directors, caused Medtronic to materially overpay for its own stock, breaching their fiduciary duties and committing corporate waste.  (*Id.* ¶ 161.)

## VII.   THE 2011 PROXY STATEMENT

Kococinski also emphasizes Medtronic's July 15, 2011 Proxy Statement, which was issued by defendants Ellis, Anderson, Calhoun, Dzau, Jackson, Lenehan, O'Leary, Powell, Pozen, Rosso, Schuler, and Ishrak, and solicited Medtronic shareholders to vote at the 2011 annual meeting.  (*Id.* ¶ 150.)  The 2011 Proxy Statement included a report from Medtronic's five-member audit committee,[10] which explained the committee's responsibility to oversee Medtronic's financial reporting.  (*Id.* ¶ 151.)

The audit committee's report stated that the committee "represents and assists the Board of Directors in its oversight of the integrity of Medtronic's financial reporting."  (*Id.*)  It explained that the committee "also has responsibility for Medtronic's compliance with legal and regulatory requirements."  (*Id.*)  In this capacity, the audit committee "recommended to the Board of Directors . . . the inclusion of the audited financial

---

[9] The weighted average price of the repurchased shares between November 2006 and November 2008 was $50.39; however, after the series of events described above, Medtronic's share price was only $31.60 on November 18, 2008.  (Compl. ¶¶ 159-60.)

[10] The audit committee members at the time were Calhoun, Jackson, Lenehan, O'Leary, and Pozen.

statements in Medtronic's Annual Report on Form 10-K for fiscal year 2011 for filing with the Securities and Exchange Commission." (*Id.*)

Kococinski asserts that the 2011 Proxy Statement was false and misleading because the audit committee failed to disclose that Medtronic had continued to promote and illegally market Infuse for off-label use and because it did not reveal the extent of Medtronic's revenue that was generated by off-label use of Infuse.   (*Id.* ¶ 152.) Kococinski claims that if this information had been disclosed, shareholders may not have voted to reelect the eleven Directors who were up for reelection.  (*Id.* ¶ 153.)

## ANALYSIS

### I.    DEMAND FUTILITY

This district recently dismissed a derivative action featuring similar allegations brought by another Medtronic shareholder for failure to make a demand and failure to establish demand futility.  *See Markewich v. Collins*, 622 F. Supp. 2d 802, 803-05 (D. Minn. 2009).  Kococinski's demand futility arguments overlap with, but are not identical to, the arguments raised in *Markewich*.

Federal Rule of Civil Procedure 23.1 sets forth special pleading requirements that apply to derivative complaints brought by shareholders to enforce the rights of the corporation.  Specifically, Rule 23.1 requires that a plaintiff "state with particularity . . . any effort by the plaintiff to obtain the desired action from the directors or comparable authority and . . . the reasons for not obtaining the action or not making the effort."  Fed. R. Civ. P. 23.1(b)(3).  As with other motions to dismiss, "[t]he well-pleaded factual

allegations of the derivative complaint are accepted as true," *Rales v. Blasband*, 634 A.2d

927, 931 (Del. 1993), and the plaintiff is "entitled to all reasonable factual inferences that

logically flow from the particularized facts alleged," *Brehm v. Eisner*, 746 A.2d 244, 255

(Del. 2000). Here, because it is undisputed that Kococinski did not make a demand on

the Board prior to bringing this action, (Compl. ¶ 186), the issue at this stage is whether

Kococinski has successfully alleged that such demand would have been futile and is

therefore excused under Minnesota law.[11]

Prior to bringing a derivative action on behalf of a corporation, a plaintiff is

ordinarily required to make a demand on the corporation's board of directors. *See, e.g.*,

*Winter v. Farmers Educ. Coop. Union of Am.*, 107 N.W.2d 226, 233 (Minn. 1961). The

Minnesota Supreme Court has long stressed the importance of a shareholder's demand on

the board of directors:

> The demand upon the managing directors and shareholders is important in
> that it gives the management of the corporation an opportunity to consider
> the merits of the dispute and to determine, in the interests of the corporation
> and shareholders, whether it might be disposed of without the expense and
> delay of litigation. The demand requirement as a condition precedent to a
> shareholder's derivative suit is one not lightly to be dispensed with.

*Id.* (footnote omitted). More recently, the Minnesota Supreme Court elaborated on the

value of the demand requirement:

> The substantive decision about whether to pursue the claims advanced in a
> shareholder's derivative action involves the weighing and balancing of
> legal, ethical, commercial, promotional, public relations, fiscal and other
> factors familiar to the resolution of many if not most corporate problems.

---

[11] The demand futility issue is governed by Minnesota law in this case because Medtronic
is a Minnesota corporation. *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 108-09 (1991).

> The careful balancing of those factors is best done by the board of directors, which is familiar with the appropriate weight to attribute to each factor given the company's product and history.

*Janssen v. Best & Flanagan*, 662 N.W.2d 876, 883 (Minn. 2003) (citation and internal quotation marks omitted).

Nonetheless, the demand requirement is excused "where it is plain from the circumstances that it would be futile." *Winter*, 107 N.W.2d at 234. Because of the scarcity of case law from Minnesota elaborating on the demand futility standard, this district has looked to the Delaware courts for guidance. *See Markewich ex rel. Medtronic, Inc. v. Collins*, 622 F. Supp. 2d 802, 808 (D. Minn. 2009); *In re Patterson Cos., Sec., Derivative & ERISA Litig.*, 479 F. Supp. 2d 1014, 1038  (D. Minn. 2007); *In re Xcel Energy, Inc.*, 222 F.R.D. 603, 606 (D. Minn. 2004). The Delaware Supreme Court has stated that demand is excused when a plaintiff "alleges particularized facts creating a reasonable doubt that a majority of the Board would be disinterested or independent in making a decision on a demand." *Rales*, 634 A.2d at 930. Relevant to the present case, a director is interested and lacks independence if he or she faces "a substantial likelihood" (as opposed to "a mere threat") of personal liability based on the plaintiff's allegations. *Aronson v. Lewis*, 473 A.2d 805, 815 (Del. 1984), *overruled on other grounds by Brehm*, 746 A.2d 244. The "substantial likelihood" standard does not require plaintiffs "to demonstrate a reasonable probability of success on the claim" because such a showing would be too onerous at the motion to dismiss stage. *La. Mun. Police Emps.' Ret. Sys. v. Pyott*, 46 A.3d 313, 351 (Del. Ch. 2012). Rather, "[p]laintiffs

need only 'make a threshold showing, through the allegation of particularized facts, that their claims have some merit.'" *Id.* (quoting *Rales*, 634 A.2d at 934).

While Delaware law provides guidance, the Court must also adhere to the principles outlined by the Minnesota Supreme Court in *Winter*. *See Reimel v. MacFarlane*, 9 F. Supp. 2d 1062, 1067 (D. Minn. 1998). The *Winter* court stated that "a demand should be made on the board of directors unless the wrongdoers constitute a majority of the board[.]" 107 N.W.2d at 266-67. However, *Winter* did not adopt a *per se* rule that demand is excused "whenever a majority of the board is accused of wrongdoing," because such a rule would allow a plaintiff to easily circumvent the demand requirement regardless of the strength of the allegations against the directors. *Markewich*, 622 F. Supp. 2d at 807. Rather, "[t]he derivative suit is recognized as an extraordinary remedy available to the shareholder as the corporation's representative only when there is no other road to redress." *Winter*, 107 N.W.2d at 233 (internal quotation marks omitted). Demand is futile only when a plaintiff demonstrates that the board of directors is "so conflicted that there existed no possibility that it would respond to a demand or that any such response would have been preordained." *In re Patterson*, 479 F. Supp. 2d at 1039. "The critical question is whether plaintiff has shown that the board was somehow so conflicted that it could not have properly responded to a demand that it address the allegations of mismanagement and wrongdoing." *In re Xcel Energy*, 222 F.R.D. at 607-08.

Here, the parties agree that if a majority of the Board[12] faces a substantial likelihood of liability for various claims in the complaint, then demand is excused as futile. The Court finds this to be a fair characterization of the burden Kococinski faces in establishing demand futility under Minnesota law.[13]

In the present case, the Court finds that the demand futility analysis is affected by an exculpatory clause in Medtronic's articles of incorporation. In Minnesota, a director's personal liability for a breach of fiduciary duty may be limited by a corporation's articles of incorporation. Minn. Stat. § 302A.251, subd. 4. Medtronic's Articles of Incorporation contain an exculpatory clause which limits its directors' liability to the full extent allowed by Minnesota law. (*See* Decl. of Peter W. Carter, Ex. 6, May 25, 2012, Docket No. 11.) The clause provides that Medtronic's directors will not be liable for breaches of fiduciary duty unless they breach the duty of loyalty, act in bad faith, engage in intentional

---

[12] Where the board contains an even number of directors, demand is futile if half of the board is interested or lacks independence. *See In re InfoUSA, Inc. Shareholders Litig.*, 953 A.2d 963, 989-90 (Del. Ch. 2007). The Court considers the board's composition "at the time th[e] action was filed." *Rales*, 634 A.2d at 937.

[13] The Court notes that under Minnesota law, it is possible that demand may not be futile if one disinterested director is available to serve on a special litigation committee. *See* Minn. Stat. § 302A.241, subd. 1. In fact, it is arguable that demand is never futile in Minnesota because section 302A.241, subdivision 1, may allow a board with no disinterested members to appoint an independent nonboard member to serve on a special litigation committee. *See* 18 John H. Matheson & Philip S. Garon, 18 *Minnesota Practice, Corporation Law & Practice* § 10.3 (2d ed. 2012) ("[T]he MBCA permits the board of a Minnesota corporation to establish a special litigation committee, which may consist solely of non-directors. Therefore, it is arguable that demand in Minnesota is never futile since someone not implicated in the lawsuit (*i.e.*, one or more outsiders) always can be commissioned to investigate . . . ." (footnote omitted)). Because the parties focused on the substantial likelihood of liability standard and because the Court will find that demand was not excused even under that standard, the Court need not consider whether section 302A.241 renders demand an absolute requirement.

misconduct, or commit a knowing violation of law. *See id.* In other words, Medtronic's directors cannot face liability for breaching the duty of care. *See Markewich*, 622 F. Supp. 2d at 809. Thus, Kococinski cannot circumvent the demand requirement by alleging facts supporting an inference of negligence or even gross negligence, because such allegations would constitute only a breach of the exculpated duty of care. *Id.* Kococinski "instead has the more difficult burden of pleading a non-exculpated claim to avoid dismissal." *Id.*[14]

For the reasons explained below, the Court will find that Kococinski has failed to allege particularized facts establishing that a majority of the Board faces a substantial likelihood of liability. Therefore, Kococinski has not established that demand was futile and the Court will grant Defendants' motion to dismiss.

## II.    KOCOCINSKI'S DEMAND FUTILITY ALLEGATIONS

Kococinski alleges that demand was futile in the present case for several reasons. First, Kococinski alleges that demand is futile as to the ten outside directors (*i.e.*, those with no material relationship to Medtronic other than serving on the Board) because they

---

[14] Kococinski asserts that it is improper to consider the exculpatory clause at the motion to dismiss stage. However, the Court finds that considering the exculpatory clause at this stage is appropriate because the clause dictates whether the Directors actually face a risk of liability on Kococinski's various claims. If the clause would protect the Directors from liability on Kococinski's claims, there is no reason to question the Directors' ability to objectively consider a demand. *See Wood v. Baum*, 953 A.2d 136, 141 (Del. 2008) ("Where directors are contractually or otherwise exculpated from liability for certain conduct, then a serious threat of liability may only be found to exist if the plaintiff pleads a non-exculpated claim against the directors based on particularized facts." (internal quotation marks omitted)).

(1) "face a substantial likelihood of liability for disregarding the settlement agreement with the Department of Justice and allowing the Company to continue to illegally market Infuse for off-label uses,"[15] (Compl. ¶ 188); (2) "face a substantial likelihood of liability for causing the Company to issue false and misleading statements about the source of Infuse's revenues and the Company's compliance with the CIA" when they "knew, or were reckless in not knowing" that the statements were false and misleading, (*id.* ¶ 189); and (3) "face a substantial likelihood of liability for causing the Company to make the share repurchases . . . at artificially inflated prices as a result of the false and misleading statements," (*id.* ¶ 190.) Second, Kococinski alleges that demand is futile as to the five outside directors that served on the audit committee for knowingly issuing or approving false and misleading statements in breach of their fiduciary duties. (*Id.* ¶¶ 191-92.) Third, Kococinski alleges that demand is futile as to Ishrak because "he is a high-ranking officer and his principal employment is with Medtronic." (*Id.* ¶ 193.)[16] Finally, although

---

[15] Although this allegation appears in the complaint, Kococinski's brief focuses on the claim that the Directors knowingly issued false and misleading financial reports and explicitly states that "Plaintiff is not alleging a claim for 'failure of oversight' for continuing to allow the Company to illegally market Infuse for off-label use." (Pl.'s Mem. in Opp. at 23, July 24, 2012, Docket No. 15.) Thus, the Court will not address the failure of oversight claim in detail. However, the Court notes that failure of oversight "is possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment." *In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996). To prevail, a plaintiff must demonstrate "that the directors were conscious of the fact that they were not doing their jobs." *Guttman v. Huang*, 823 A.2d 492, 506 (Del. Ch. 2003). Kococinski has not presented particularized facts that support a reasonable inference that the directors consciously "fail[ed] to attend to their duties in good faith." *Id.*

[16] The Court need not determine whether demand was futile as to Ishrak because the Court will not find that demand was futile as to any of the other directors and Kococinski must

(Footnote continued on next page.)

it does not appear in the portion of the complaint outlining reasons why demand is allegedly futile, Kococinski's brief makes clear that she intends to allege that demand is futile because all Directors face a substantial likelihood of liability for issuing the 2011 Proxy Statement that contained false and misleading statements. (*Id.* ¶ 198.)[17]

_____

(Footnote continued.)

establish that demand was futile as to at least half of the directors. *See In re InfoUSA*, 953 A.2d at 989-90.

[17] Kococinski asserts that demand is futile for two additional reasons, neither of which is sufficient. First, Kococinski alleges that demand is futile as to all Directors because their Directors and Officers Liability Insurance would not protect them from an action brought directly by Medtronic, but it would protect them against a derivative suit, and they cannot be expected to file the claims that would deprive them of insurance coverage. (Compl. ¶ 194.) This argument is consistently rejected as a basis for finding demand futility. *See, e.g.*, *In re Am. Int'l Grp., Inc. Derivative Litig.*, 700 F. Supp. 2d 419, 433 (S.D.N.Y. 2010) ("[D]emand futility based on the existence of an 'insured vs. insured' exclusion in the Company's directors' and officers' liability insurance policies is an argument that has been rejected repeatedly under Delaware law." (internal quotation marks omitted)); *Markewich*, 622 F. Supp. 2d at 808 n.6. Kococinski's allegation is generic and essentially asks the Court to assume that the outside directors would act in bad faith. The Court finds that Kococinski's claim regarding the Directors' insurance coverage does not establish demand futility.

Second, Kococinski alleges that Medtronic has suffered significant losses due to the Directors' wrongdoing but the Directors have not filed any lawsuits against themselves, in breach of their fiduciary duties. Finding demand futility on the basis that the Board has not yet filed a lawsuit would dramatically undermine the demand requirement. (Compl. ¶ 196.) It would render demand futile in almost every case because if a board of directors had already commenced a lawsuit addressing the conduct that a potential derivative plaintiff wanted to challenge, there would be little reason for the derivative plaintiff to commence the same action. *See Richardson v. Graves*, C.A. No. 6617, 1983 WL 21109, at *3 (Del. Ch. June 17, 1983) ("The mere fact that they have not elected to sue before the derivative action was filed should not of itself indicate 'interestedness.' As a matter of fact, it is the Board's inaction in most every case which is the *raison d'etre* for Rule 23.1."). Additionally, the Minnesota Supreme Court has stressed that the demand requirement "gives the management of the corporation an opportunity to consider the merits of the dispute and to determine, in the interests of the corporation and shareholders, whether it might be disposed of without the expense and delay of litigation." *Winter*, 107 N.W.2d at 233. Thus, the Court will not find demand futility on the basis that the Board has not yet taken action.

A.     **Knowingly False and Misleading Financial Reports**

One of Kococinski's primary allegations is that demand is futile because the Directors face a substantial likelihood of liability for knowingly issuing false and misleading financial statements like the 2007 Form 10-K.  This District recently analyzed the very same allegedly false and misleading statements regarding Infuse in a securities class action.  *See Minneapolis Firefighters' Relief Ass'n v. Medtronic, Inc.*, Civ. No. 08-6324, 2010 U.S. Dist. LEXIS 10029 (D. Minn. Feb. 3, 2010).   In *Minneapolis Firefighters*, the issue was whether plaintiffs had sufficiently alleged that the officer defendants knowingly made untruthful material statements about Infuse.   The court concluded that three categories of statements (each of which is alleged in the present case) were sufficient to survive a motion to dismiss: "[1] statements that attributed the growth in Infuse sales to on-label uses of Infuse, [2] statements predicting increased Infuse sales from additional on-label uses, and [3] statements about Medtronic's efforts to comply with the Corporate Integrity Agreement."   *Id.* at *27.[18]

Here, the Court will assume without deciding that the analysis in *Minneapolis Firefighters* was correct and that the 2007 Form 10-K and other similar financial reports were false and misleading.   However, the existence of false and misleading financial

---

[18] On the other hand, the court held that the following categories of statements were not misleading enough to be actionable: (1) statements about the general importance of complying with regulations (but not referring to the CIA specifically), *Minneapolis Firefighters*, 2010 U.S. Dist. LEXIS 10029, at *20-21; (2) statements about newly approved on-label uses of Infuse (as opposed to statements suggesting that future growth would be based on on-label uses), *id.* at *23-24; and (3) statements about competitors' aggressive marketing practices, *id.* at *26-27.

statements, by itself, is insufficient to establish a substantial likelihood of liability for a non-exculpated claim on the part of outside directors.  *See, e.g.*, *Xcel Energy*, 222 F.R.D. at 607-08 (holding that "false or misleading statements by [defendant's] **management**" do not demonstrate that "**the board** was somehow so conflicted that it could not have properly responded to a demand" (emphases added)); *Wood v. Baum*, 953 A.2d 136, 142 (Del. 2008) ("The Board's execution of [the company]'s financial reports, without more, is insufficient to create an inference that the directors had actual or constructive notice of any illegality.").   In order to establish a substantial likelihood of liability for a non-exculpated claim, such as a breach of the duty of loyalty,[19] Kococinski must plead facts that would at least support a reasonable inference that the directors **knew** that the statements were false and misleading when issued.  Absent such a showing, Kococinski can make out no more than a breach of the exculpated duty of care, which is insufficient to survive the instant motion to dismiss.  *See Zirn v. VLI Corp.*, 681 A.2d 1050, 1062 (Del. 1996) ("A good faith erroneous judgment as to the proper scope or content of required disclosure implicates the duty of care rather than the duty of loyalty.").

Here, the complaint offers no direct evidence that the Directors actually knew how Infuse was marketed or the composition of Infuse's sales.  Kococinski did not inspect

---

[19] *See, e.g.*, *Malone v. Brincat*, 722 A.2d 5, 10 (Del. 1998) ("The issue . . . is whether [defendants] breached their more general fiduciary duty of loyalty and good faith by knowingly disseminating to the stockholders false information about the financial condition of the company."); *In re Reliance Sec. Litig.*, 91 F. Supp. 2d 706, 732 (D. Del. 2000) (holding that allegations that "permit the inference that [Directors] may have knowingly withheld material information from the company's shareholders . . . may rise to a violation of the directors' duty of loyalty").

Medtronic's books and records pursuant to Minn. Stat. § 302A.461, subd. 4, and thus cannot allege that the Directors actually discussed these issues at a particular meeting, nor can she allege that the Directors reviewed documents relating to these issues.[20]   Rather, Kococinski must rely on the various facts alleged in the complaint to support a reasonable inference that the Directors knew that the financial reports were false and misleading. The Court will consider Kococinski's theories in turn.

### 1.      Core Operations

The Court must determine whether the fact that Infuse represented six percent of Medtronic's revenues supports a reasonable inference that the outside directors knew that the financial reports were false and misleading.   Some courts, particularly in the securities fraud context, have held that knowledge of facts critical to a company's core business operations can be imputed to a company's top **officers**.   *See In re Forest Labs., Inc. Derivative Litig.*, 450 F. Supp. 2d 379, 390-91 (S.D.N.Y. 2006) (compiling cases). For example, the *Minneapolis Firefighters* court found that scienter (a required element of securities fraud) was successfully alleged because Infuse represented six percent of Medtronic's total sales, which "is enough to raise at least a plausible inference that **senior**

---

[20] *See Pyott*, 46 A.3d at 342-43 ("[T]he Delaware courts have long exhorted potential derivative plaintiffs to use Section 220 to investigate their claims and obtain corporate books and records **before** filing derivative litigation."); *Markewich*, 622 F. Supp. 2d at 810 n.9 ("Prior to filing the Complaint in this case, Plaintiff could have inspected Medtronic's books and records to amass a more robust factual predicate to survive a motion to dismiss, but chose not to do so."); *In re InfoUSA*, 953 A.2d at 973 ("Plaintiffs have followed this Court's oft-issued advice and brought their action based upon documents received as part of a request for books and records under 8 Del. C. § 220. As a result, the amended consolidated complaint overflows with detail.").

**management** would have known about [it]."[21]   2010 U.S. Dist. LEXIS 10029, at *29 (emphasis added).  Kococinski attempts to rely on *Minneapolis Firefighters* and the "core operations" theory to establish knowledge on the part of Medtronic's outside directors.

The Court finds that the distinction between senior officers and outside directors is critical in the present case.  Under Minnesota law, "[d]irectors are entitled to rely on the day-to-day judgments of a corporation's management."  *Markewich*, 622 F. Supp. 2d at 811 (citing Minn. Stat. § 302A.251, subd. 2).  In fact, some courts have determined that a core operations theory of proving knowledge is **never** applicable to outside directors.  *See In re Forest Labs.*, 450 F. Supp. 2d at 390-91 ("While it is true that . . . knowledge of facts critical to the continued viability of major transactions or 'core' business operations have been imputed to a company and its 'key' or 'top' **officers**, there is no authority to support the attribution of knowledge to Outside Directors who are not alleged to be directly involved in the day-to-day operations of the company." (emphasis in original)).

Only in rare cases has a core operations theory been applied to outside directors, and those cases involved operations that were substantially more "core" than six percent of a company's business.  *See Cosmas v. Hassett*, 886 F.2d 8, 10-11, 13 (2d Cir. 1989) (holding that scienter was properly alleged where the issue was whether directors knew of import restrictions that would eliminate $5 million of a company's $6 million in backlog sales because those sales "represent a significant part of [the company]'s business"); *In re Biopure Corp. Derivative Litig.*, 424 F. Supp. 2d 305, 308 (D. Mass.

---

[21] While scienter in a securities class action is not necessarily identical to the showing of knowledge Kococinski must make in the present case, it is at least analogous.

2006) (holding that knowledge of an FDA clinical hold was properly alleged because it was a case "in which a company's primary product or service is in jeopardy").[22]  Here, Infuse accounts for only six percent of Medtronic's revenues.  The Court does not hold that a core operations theory can never support a reasonable inference of knowledge on the part of an outside director, but in the present case, the allegedly false and misleading information is not sufficiently vital to Medtronic's business to support an inference of outside directors' knowledge in the absence of more direct evidence.  *See In re Forest Labs.*, 450 F. Supp. 2d at 390-93 ("Although [the drugs] do comprise an overwhelming majority of [the company]'s business, [eighty two percent,] it cannot follow that every fact pertaining to those drugs may reasonably be imputed to Outside Directors.").

### 2.    Red Flags

The Court must next determine whether the various red flags and evidence gathered from newspaper articles support a reasonable inference that Medtronic's outside directors knew that Medtronic's financial statements were false and misleading.  As noted above, Kococinski has not presented any direct evidence that the outside directors actually knew that the financial reports were false and misleading.  For this reason, the

---

[22] A final case cited by Kococinski, *Pfeiffer v. Toll*, 989 A.2d 683, 693 (Del. Ch. 2010) overruled on other grounds by *Kahn v. Kolberg Kravis Roberts & Co., L.P.*, 23 A.3d 831 (Del. 2011), is distinguishable because it was decided "under the plaintiff-friendly Rule 12(b)(6) standard" and actually distinguished other cases that, like the present case, "were decided under Rule 23.1's particularity standard and in a procedural posture where the plaintiff sought to establish demand futility by showing that the directors faced a substantial risk of liability."  *Id.* at 692-93.  It also appears that the information at issue in *Pfeiffer* related to the company's entire business, and was substantially more "core" than Medtronic's marketing strategies for a drug representing six percent of its revenue.  *See id.* at 693.

present case is distinguishable from cases Kococinski highlights in which courts have held that demand was futile.

For example, *Louisiana Municipal Police Employees' Retirement System v. Pyott* involved illegal off-label marketing of a drug and the allegations were quite similar to the present case.  46 A.3d 313, 323 (Del. Ch. 2012).  However, unlike the complaint in the present case, the complaint in *Pyott* was supported by internal documents obtained through a Delaware statute similar to Minn. Stat. § 302A.461, *id.* at 359, including an email from the company's general counsel to the Board that specifically alerted the Board to illegal marketing that had occurred and warned the Board that "the chance of receiving Agency action . . . on this matter is . . . very high," *id.* at 320.  The internal documents revealed that, shortly after receiving this email, the Board approved a 2007-2011 Strategic Plan that "explicitly linked the number of sales representatives . . . to increased off-label sales" and led to the company tripling the payroll for the sales force.  *Id.* at 320-21.  Finally, the complaint in *Pyott* "plead[ed] that the Board regularly monitored Botox sales and cite[d] specific occasions where the Board was made aware of growth in average daily sales and the revenue mix across different usage categories."  *Id.* at 354.  To the contrary, in the present case, Kococinski has provided no evidence of what the outside directors **actually** discussed and considered.

A similarly distinguishable case is *InfoUSA*, where the issue was whether SEC filings misrepresented the nature of immense benefits that were provided to the

company's CEO.  953 A.2d at 990.  The complaint described a report prepared by one

board members that outlined the nature of the benefits in detail.[23]  The Court explained:

> The [Report] was distributed to [the directors] . . . shortly before the
> company released its 2004 10–K . . . .  The 10–Ks affirmatively stated that
> payments made to [the CEO] involved "usage of aircraft and related
> services."  Yet the [Report] indicates that almost $600,000 worth of the
> payments constituted compensation for the use of personal residences, the
> *American Princess* yacht, travel services or payments to contractors.  No
> conceivable definition of candor will shoehorn such payments into services
> "related" to the use of aircraft. . . .  The Court may reasonably infer, based
> upon these allegations, that the directors who signed the 2004 and 2005 10–
> Ks did so knowing that the information contained therein fell far below the
> standards of candor expected from them.

*Id.* at 990-91.  In the present case, Kococinski has not produced comparable evidence of

specific information that the outside directors actually reviewed and discussed.[24]

In the absence of direct evidence, Kococinski relies on a variety of red flags that

purportedly support an inference that the outside directors actually knew the details of

Infuse's marketing and sales.  Kococinski focuses on Medtronic's $40 million settlement

with the DOJ and the accompanying CIA, the series of newspaper articles revealing

details of Senator Grassley's investigation and Medtronic's financial arrangements with

various surgeons, and additional investigations by state and federal authorities.  For the

---

[23] As in *Pyott*, the plaintiffs in *InfoUSA* took advantage of the Delaware statute that allows potential plaintiffs to inspect a company's books and records.  *See id.*, at 973.

[24] *See also In re Forest Labs., Inc. Derivative Litig.*, 450 F. Supp. 2d at 390 ("The Complaint does not identify any types of reports, studies, or analyses made available to the Board, or board meeting minutes reflecting conversations from which the Court may infer that the Outside Directors had actual knowledge of the Danish Study or any other alleged inside information.").

reasons explained below, the Court finds that none of these red flags allow a reasonable inference that the outside directors knew that the financial reports, like the 2007 Form 10-K, were false and misleading at the time they were made.

This district has already held that Medtronic's $40 million settlement with the DOJ "do[es] not establish the knowledge of the [outside directors]" because "Plaintiff 'has not pleaded facts indicating that the challenged settlements were anything other than routine business decisions in the interest of the corporation.'"   *Markewich*, 622 F. Supp. 2d at 812 (quoting *White v. Panic*, 783 A.2d 543, 553 (Del. 2001)).  Further, the CIA that accompanied the DOJ settlement applied directly to Medtronic's management, not to its outside directors.  (Pl.'s Mem. in Opp. at 32.)  Even if the Board considered the merits of the DOJ's allegations, the settlement at most put the Board on notice that Medtronic may have illegally marketed Infuse in the past, but not that such behavior continued during the time of the challenged financial statements.  Neither the settlement nor the accompanying CIA support a reasonable inference that the outside directors knew the detailed information about Infuse that rendered the financial statements false and misleading.[25]

The Court also finds that none of the additional facts Kococinski presents that were not included in the *Markewich* complaint support a reasonable inference that the

---

[25] Kococinski again relies on *Minneapolis Firefighters*, which held that scienter was sufficiently alleged as to Medtronic's officers because Medtronic's $40 million settlement with the DOJ and the accompanying CIA represented Medtronic's "agree[ment] that its **senior management** would monitor Medtronic's activities in this regard."  2010 U.S. Dist. LEXIS 10029, at *30 (emphasis added).  This holding does not apply to Medtronic's outside directors.

outside directors actually knew that the financial reports were false and misleading. Kococinski's additional facts are drawn from a series of newspaper articles revealing improper financial arrangements that Medtronic had with physicians across the country. Much of the information was uncovered by Senator Grassley's investigation of Medtronic and Kococinski places particular emphasis on a September 30, 2008 letter that Senator Grassley allegedly sent to then-CEO and Chairman of the Board Hawkins requesting a list of the physicians receiving payments related to Infuse. Kococinski claims it is reasonable to infer that Hawkins would have shared that letter with the Board, which at the time included more than half of the current Directors.[26]

Yet, the fact that the Board may have known that Senator Grassley's investigation was underway does not support a inference that the Board actually knew that illegal conduct was occurring related to Infuse. The same is true of the more recent investigations opened by various state and federal authorities. While these red flags may tend to establish that Medtronic **employees** were marketing Infuse illegally and that Medtronic's **officers** likely knew the details of Infuse's marketing and sales, they are insufficient, in the absence of more direct evidence, to support an inference that the

---

[26] Kococinski's claim that the letter was likely shared with the Board does not appear in the complaint, which is problematic because Kococinski is required to plead with particularity the reasons why demand was futile. *See Markewich*, 622 F. Supp. 2d at 812-13. However, even with the benefit of the inference that the letter reached the entire Board, Kococinski still fails to establish demand futility.

outside directors actually knew these details.[27]   Kococinski's presentation of these red flags falls short of pleading particularized facts supporting an inference that the outside directors actually knew the financial reports were false and misleading.   Thus, the complaint does not establish that the Board was "so conflicted that it could not have properly responded to a demand that it address the allegations," *In re Xcel Energy*, 222 F.R.D. at 608, and it is not "plain from the circumstances that [demand] would be futile," *Winter*, 107 N.W.2d at 234.

### 3.     The Audit Committee

The Court must also determine whether the five outside directors that sat on Medtronic's Audit Committee face a substantial likelihood of liability for the allegedly false and misleading financial statements.   Kococinski does not provide a particularized allegation about the Audit Committee's knowledge.   Rather, she generically states that the Audit Committee members have knowledge "[a]s a result of (a) their access to and review of internal corporate documents; (b) conversations and connections with other corporate officers, employees and directors; and (c) attendance at management and Board

---

[27] Again, even if these facts could allow a jury to find that the directors were negligent because they **should** have known about Infuse's marketing and sales and **should** have known that the financial reports were false and misleading, such allegations are insufficient because the directors cannot face liability for a breach of the duty of care.   *See Benihana of Tokyo, Inc. v. Benihana, Inc.*, 891 A.2d 150, 192 (Del. Ch. 2005) *aff'd* 906 A.2d 114 (Del. 2006) ("Director liability for breaching the duty of care is predicated upon concepts of gross negligence." (internal quotation marks omitted)).

meetings." (Compl., ¶192.)[28]  Committee membership alone cannot support a reasonable inference of knowledge on the part of an outside director.  *See Markewich*, 622 F. Supp. 2d at 811 (surveying Delaware law and concluding that "it is well settled that committee membership is an insufficient basis on which to infer knowledge").  The members of the Audit Committee, like the other outside directors, cannot face liability for a breach of the exculpated duty of care.  At most, Kococinski's allegations tend to establish that the Audit Committee members should have known that the statements were false and misleading.  However, in the absence of more direct and particularized allegations, the complaint does not support a reasonable inference that the Audit Committee members actually knew that the statements were false and misleading.  *See Xcel Energy*, 222 F.R.D. at 607 (holding that an audit committee's "heightened duty to monitor the corporation's activities and investigate the facts underlying its public statements" is insufficient to establish knowledge and could not substitute for the required particularized facts establishing the directors' knowledge).

### B.    Share Repurchases

The Court must next address Kococinski's contention that the ten outside director defendants face a substantial likelihood of liability for causing Medtronic to repurchase $2.8 billion of its own stock at artificially inflated prices between November 2006 and

---

[28]  Kococinski also sets forth the Audit Committee's Charter, which explains those directors' duties to "review and approve quarterly and annual financial statements, earnings press releases, and the Company's internal controls over financial reporting."  (Compl. ¶ 164.)

November 2008.  The Court finds that the share repurchase allegation fails to establish demand futility for the same reason that Kococinski's allegations regarding false and misleading financial statements fail.  That is, there is insufficient evidence that the outside directors actually knew the underlying information that rendered the stock artificially inflated.[29]

### C.  2011 Proxy Statement

Finally, the Court must determine whether Kococinski has successfully established demand futility on the basis that the Directors face a substantial likelihood of liability for issuing the 2011 Proxy Statement, which Kococinski alleges was materially false and misleading.  For the reasons below, the Court will find that demand was not futile because of Kococinski's allegations relating to the 2011 Proxy Statement.

Rule 23.1 provides that **the complaint** must "state with particularity" the reasons for not making a demand on the board of directors.  *See* Fed. R. Civ. P. 23.1(b).  Kococinski appropriately devoted a section of her complaint to explaining the various

---

[29] There appear to be other potential flaws with the share repurchase claim, which the Court need not address.  For example, Kococinski has not suggested what motive there might have been for the Directors to repurchase shares they knew were overvalued and likely to fall in price.  *See In re Textron, Inc.*, 811 F. Supp. 2d 564, 576 (D.R.I. 2011) ("The complaint . . . contains no allegations that any of the board members other than [the CEO] received any personal benefit or engaged in any impermissible self-dealing when they approved and implemented the repurchase program."); *In re Am. Int'l Grp., Inc. Derivative Litig.*, 700 F. Supp. 2d 419, 441 (S.D.N.Y. 2010) ("This Court previously dismissed a [waste of corporate assets] claim on the grounds that the plaintiffs had failed to plead any particularized allegation regarding what motive the directors of a public company might possibly have to repurchase shares that they knew were overvalued and were likely to fall in price.").

reasons she contended that demand would have been futile.  (*See* Compl. ¶¶ 188-96.) However, Kococinski did not refer to the 2011 Proxy Statement in this section of the complaint and nowhere in the complaint does Kococinski allege, even generally, that the directors' potential liability for the 2011 Proxy Statement is one of "the reasons for . . . not making the effort" of a demand on the Board.   Fed. R. Civ. P. 23.1(b)(3)(B). Although the 2011 Proxy Statement is discussed in the complaint and is the basis for Count I, Kococinski's failure to plead, even generally, that the 2011 Proxy Statement rendered demand futile prevents the Court from finding demand futility on that basis.[30]

For all of the reasons described above, the Court finds that Kococinski has failed to establish demand futility and will grant defendants' motion to dismiss.

---

[30] Medtronic did not address the 2011 Proxy Statement in its opening brief, likely because it addressed only those arguments Kococinski included in the demand futility section of her complaint.  Therefore, briefing on the substance of the 2011 Proxy Statement was cursory. The Court notes that the 2011 Proxy Statement argument **may** have substantive weaknesses that would not be cured by including it in the demand futility section of the complaint.  For one, in light of the increasing public scrutiny of Medtronic's Infuse marketing, it is possible that the omissions from the 2011 Proxy Statement were not materially misleading because there may not be a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."  *See TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976); *see also United Paperworkers Int'l Union v. Int'l Paper Co.*, 985 F.2d 1190, 1199 (2d Cir. 1993) ("[W]hen the subject of a proxy solicitation has been widely reported in readily available media, shareholders may be deemed to have constructive notice of the facts reported, and the court may take this into consideration in determining whether representations in or omissions from the proxy statement are materially misleading.").  If Kococinski elects to amend her complaint, this issue and other issues concerning the 2011 Proxy Statement can be explored more thoroughly.

**ORDER**

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED** that Defendants' Motion to Dismiss [Docket No. 8], in which

Medtronic joins [Docket No. 13], is **GRANTED** and Plaintiff's complaint [Docket

No. 1] is **DISMISSED without prejudice**.   Kococinski may file an amended complaint

within sixty (60) days of this Order.

DATED:   March 25, 2013                             _____s/ John R. Tunheim_____
at Minneapolis, Minnesota.                               JOHN R. TUNHEIM
                                                      United States District Judge